**SEALED**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION



FILED
APR 07 2021
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | Cause No.: |
| Plaintiff, | § § § | **FILED UNDER SEAL** |
| | § | **INDICTMENT** |
| v. | § § | [**Count One:** 18 U.S.C §§ 1343, 1349, Conspiracy to Commit Wire Fraud, |
| JUAN ENRIQUE KRAMER (1), ADRIANA PASTOR (2), NOEL OLGUIN (3), KARINA HERNANDEZ (4) | § § § § § | **Counts Two - Five** 18 U.S.C § 1343, Wire Fraud.] |
| Defendants. | § § | |

SA21CR0154 FB

THE GRAND JURY CHARGES:

At all times material to this Indictment:

## DEFENDANTS AND THEIR BUSINESS ENTITIES

1. Defendant **JUAN ENRIQUE KRAMER** was a citizen of Mexico with a visa permitting him to reside within the United States, and the husband of Defendant **ADRIANA PASTOR**.

2. Defendant **ADRIANA PASTOR** was a citizen of Mexico with a visa permitting her to reside within the United States, and the wife of Defendant **JUAN ENRIQUE KRAMER**.

3. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** frequently resided within the San Antonio, Texas area, within the Western District of Texas.

4. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** were the owners and operators of multiple businesses incorporated within the United States, including Emprequekas, LLC, and La Cantinita Holding, LLC. These companies were primarily focused on marketing and operating Mexican food restaurants.

5. In addition to directly running the restaurants, Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** also advertised and promoted their ability to create similar restaurants for sale to investors.

6. Defendant **NOEL OLGUIN** was a citizen of the United States who was part owner of a business called Texas Franchise and Business Consulting (TFBC). This business mainly targeted and marketed to Mexican nationals who were interested in starting businesses located within Texas. Defendant **NOEL OLGUIN** was hired by Mexican investors to help them locate Texas-based businesses to invest in, for which TFBC was paid a commission.

7. Defendant **KARINA HERNANDEZ** was a citizen of the Mexico with a visa to reside within the United States and was also a part owner of TFBC. Defendant **KARINA HERNANDEZ** was hired by Mexican investors to help them locate Texas-based businesses to invest in, for which TFBC was paid a commission.

## COUNT ONE
### CONSPIRACY TO COMMIT WIRE FRAUD
### [18 U.S.C. §§ 1343, 1349]

8. Beginning in or about December of 2015, and continuing to in or about January of 2019, in the Western District of Texas and elsewhere, the Defendants

**JUAN ENRIQUE KRAMER (1),**
**ADRIANA PASTOR (2),**
**NOEL OLGUIN (3),**
**and KARINA HERNANDEZ (4),**

together and with persons known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree together and with each other and with other individuals both known and unknown to the Grand Jury to devise and execute a scheme to defraud

2

multiple complainant investors and to obtain money by means of false and fraudulent pretenses, representations and promises, utilizing transmissions by wire in interstate and foreign commerce, in violation of Title 18, United States Code, §§ 1343 and 1349.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

9. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** marketed themselves as successful owners and operators of multiple restaurant locations within the United States and Mexico. The primary business that Defendants promoted was a line of Mexican food restaurants called "Las Quesadillas". Defendants did in fact own and operate multiple Las Quesadillas locations throughout Texas, including at least one in San Antonio.

10. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** advertised that they were able to deliver "turn-key" restaurants to investors for a set fee. A "turn-key" restaurant meant that the Defendants would perform all the steps necessary to create and open a fully functional "Las Quesadillas" location. According to the Defendants' promotional literature, this included: finding and renting a suitable location, obtaining all necessary permits, assistance obtaining visas for investors to reside in the United States, completion of all construction, providing all necessary equipment, recipes, employee training, and handling all legal fees and incorporation issues. In sum, the concept sold by Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** was that they would create an operating restaurant within three to four months of beginning construction, and then hand the business to the investor.

11. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** charged approximately $105,000 to $115,000 for a single location, or approximately $250,000 for a "master license" agreement where they would promise not to open or sell any other Las Quesadillas restaurants within a certain area.

12. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** primarily targeted Mexican national investors who were looking to open a business in the United States.

13. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** advertised in print and online, offering franchise opportunities involving Las Quesadillas.

14. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** agreed with Defendants **NOEL OLGUIN** and **KARINA HERNANDEZ** that TFBC would solicit business for the Las Quesadillas franchise and be paid a commission sales to investors in return.

15. **NOEL OLGUIN** would attend investment fairs and conferences in Mexico and advertise his ability to help Mexican investors create a business within the United States. **NOEL OLGUIN** and **KARINA HERNANDEZ** met with investors and promoted the Las Quesadillas concept. **NOEL OLGUIN** and **KARINA HERNANDEZ** represented to potential investors that they had vetted Las Quesadillas and that it was a safe and secure opportunity. In fact, **NOEL OLGUIN** and **KARINA HERNANDEZ** were aware that **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** repeatedly took investor money, failed to deliver on their contracts, and refused to return investor funds.

16. **NOEL OLGUIN, KARINA HERNANDEZ,** and TFBC were paid approximately $20,000 to $25,000 as a commission for each successful deal that they brought to Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR**.

4

17. Between January of 2016 and January of 2019, Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** entered into agreements with multiple investors in which they contracted to deliver them a fully operational Las Quesadillas franchise. Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** operated this business through the Emprequekas, LLC company, which was incorporated in Texas and listed a San Antonio address as its principal place of business.

18. Defendant **JUAN ENRIQUE KRAMER** frequently promoted the Las Quesadillas business by displaying false and fraudulent accounting numbers to prospective investors, thereby deceiving them about the potential profitability of their investment.

19. Defendants **JUAN ENRIQUE KRAMER, ADRIANA PASTOR, NOEL OLGUIN,** and **KARINA HERNANDEZ** marketed and sold multiple Las Quesadillas "turn-key" locations knowing that the locations would not be completed. On multiple occasions during this time frame, Defendants **JUAN ENRIQUE KRAMER, ADRIANA PASTOR, NOEL OLGUIN,** and **KARINA HERNANDEZ** took investor funds and failed to provide the promised services. In some instances, Defendants took investor funds and never provided anything of value in return.

20. More frequently, Defendant **JUAN ENRIQUE KRAMER** would begin construction on a location selected by the investor, only to never complete the project beyond some initial construction. Because the majority of the investors resided in Mexico, they were unable to regularly visit the locations. Defendant **JUAN ENRIQUE KRAMER** would communicate with them via phone calls and emails transmitted over the interstate and international wires, and state that the construction process was proceeding as planned, or provide excuses and explanations as to why there were delays. Defendant **JUAN ENRIQUE KRAMER** made these representations

knowing that they were false and that the restaurants would not be completed as scheduled, or at all.

21.     When investors eventually discovered that the restaurants were not actually being built on time, Defendant **JUAN ENRIQUE KRAMER** would give excuses as to the reason for the delay. When investors began asking for their money to be returned, Defendant **JUAN ENRIQUE KRAMER** would offer partial refunds, or stakes in other businesses as an alternative to repayment. When these methods failed, Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** would then threaten to sue the investors for breach of contract, before cutting off all communication entirely.

22.     Rather than use the investor funds to construct and complete the restaurant locations, Defendants **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** used the funds for their own personal expenses and to provide partial payments to previous investors who were demanding their money back.

23.     **NOEL OLGUIN** and **KARINA HERNANDEZ** were aware that **JUAN ENRIQUE KRAMER** and **ADRIANA PASTOR** would take investor money without finishing the promised projects but continued to market Las Quesadillas to prospective investors to obtain a commission payment.

24.     Defendants **JUAN ENRIQUE KRAMER, ADRIANA PASTOR, NOEL OLGUIN,** and **KARINA HERNANDEZ** perpetrated this scheme on at least eight different victims between January of 2016 and January of 2019, resulting in a total loss of more than $1,000,000.

## OVERT ACTS

In furtherance of this conspiracy and to effect and accomplish its objects, the Defendants, or one or more unindicted conspirators, committed, among others, the following overt acts in the Western District of Texas and elsewhere:

25. In or about December of 2015, Defendant **NOEL OLGUIN** met with complainant CW1 at a business conference in Mexico and arranged a meeting in San Antonio with Defendant **JUAN ENRIQUE KRAMER** to promote the Las Quesadillas business.

26. On or about April 1, 2016, Defendant **JUAN ENRIQUE KRAMER** met with CW1 in San Antonio, Texas, and executed a contract where Defendant **JUAN ENRIQUE KRAMER** agreed to provide a turn-key restaurant location in Austin, Texas, and rights to the franchise for the entire Austin area in return for $250,000.

27. On or about April 1, 2016, Defendant **JUAN ENRIQUE KRAMER** met with CW1 in San Antonio, Texas and executed a contract where Defendant **JUAN ENRIQUE KRAMER** agreed to provide a turn-key restaurant location in San Antonio, Texas in return for $115,000.

28. In or about March of 2016, **NOEL OLGUIN** directed CW1 to pay $50,000 to TFBC as a commission for arranging the above-described agreements. On or around March 18, 2016, CW1 sent $25,000 to TFBC. On or around March 25, 2016, CW1 sent the remaining $25,000 to TFBC.

29. On or about April 5, 2016, **NOEL OLGUIN** transmitted a copy of these agreements to CW1 in Mexico via electronic mail. **JUAN ENRIQUE KRAMER** was copied on this e-mail communication.

30. Between on or about March 2016 and on or about May 2016, Defendants **JUAN ENRIQUE KRAMER** and **NOEL OLGUIN** accepted approximately $325,000 in payments from CW1.

31. In or about March of 2016, Defendant **NOEL OLGUIN** met with complainant CW2 at a business conference in Mexico and arranged a meeting in El Paso, Texas with Defendant **JUAN ENRIQUE KRAMER** to promote the Las Quesadillas business.

32. In or about June of 2016, Defendant **JUAN ENRIQUE KRAMER** met CW2 in San Antonio, Texas and agreed to provide one turn-key location and a master license for the El Paso area in exchange for $250,000.

33. In or about June of 2016, Defendant **JUAN ENRIQUE KRAMER** accepted $250,000 in payments from CW2.

34. In or about March of 2017, Defendant **ADRIANA PASTOR** met with CWs 3 and 4 in San Antonio, Texas, and discussed their potential purchase of a Las Quesadillas franchise.

35. On or about August 4, 2017, Defendant **JUAN ENRIQUE KRAMER** met with CWs 3 and 4 in San Antonio, Texas, and executed a contract where CWs 3 and 4 agreed to place $25,000 in escrow, to be applied toward the future purchase of a Las Quesadillas franchise.

36. On or about August 4, 2017, Defendant **JUAN ENRIQUE KRAMER** met with CWs 3 and 4 in San Antonio, Texas, and executed a contract where CWs 3 and 4 agreed to pay $105,000 in exchange for a single turn-key Las Quesadillas location in San Antonio, Texas.

37. Between on or about August 4, 2017 and August 10, 2017, Defendant **JUAN ENRIQUE KRAMER** accepted $105,000 from CWs 3 and 4 in payment.

38. In or about October of 2016, CW5 engaged **KARINA HERNANDEZ** and **NOEL OLGUIN** to provide options for businesses in Texas for CW5 to invest in.

39. In or about March of 2017, Defendants **KARINA HERNANDEZ** and **NOEL OLGUIN** accepted $25,000 in payments from CW5.

40. On or about June 17, 2017, Defendant **JUAN ENRIQUE KRAMER** met with CW5 in Houston, Texas and executed a contract where CW5 agreed to pay Defendant **JUAN ENRIQUE KRAMER** $350,000 in exchange for one Las Quesadillas location to be created in Houston, Texas, and a master license for part of the Houston area.

41. Between June 27, 2017 and February 28, 2018, Defendant KRAMER accepted approximately $300,000 from CW5 in payment.

All in violation of Title 18, United States Code, § 1349.

## COUNTS TWO AND THREE
### WIRE FRAUD
### [18 U.S.C. § 1343]

42. The Grand Jury incorporates by reference paragraphs 1 through 41 set out above as though fully restated and re-alleged herein.

43. From in or around January of 2016, and continuing to in or around January of 2019, in the Western District of Texas and elsewhere, the Defendant,

**JUAN ENRIQUE KRAMER (1),**

aided and abetted by others known and unknown to the Grand Jury, and with intent to defraud, did unlawfully, willfully, and knowingly devise and execute the above-described scheme to defraud multiple victims known to the Grand Jury and to obtain money or property by means of materially false or fraudulent pretenses, knowingly did cause to be transmitted by wire in interstate and

international commerce writings in violation of Title 18, United States Code, Section 1343, as set forth below:

| Count | Victim | Date | Item |
|---|---|---|---|
| 2 | CW 1 | 12/28/2016 | Email to CW 1 detailing progress on restaurant |
| 3 | CW 2 | 6/17/2016 | Wire transfer for $164,179.56 from Mexico to the United States |

**COUNT FOUR**
WIRE FRAUD
[18 U.S.C. § 1343]

44. The Grand Jury incorporates by reference paragraphs 1 through 41 set out above as though fully restated and re-alleged herein.

45. From in or around January of 2016, and continuing to in or around January of 2019, in the Western District of Texas and elsewhere, the Defendants,

**JUAN ENRIQUE KRAMER (1),
NOEL OLGUIN (3),
and KARINA HERNANDEZ (4),**

aided and abetted by others known and unknown to the Grand Jury, and with intent to defraud, did unlawfully, willfully, and knowingly devise and execute the above-described scheme to defraud multiple victims known to the Grand Jury and to obtain money or property by means of materially false or fraudulent pretenses, knowingly did cause to be transmitted by wire in interstate and international commerce writings in violation of Title 18, United States Code, Section 1343, as set forth below:

| 4 | CW 5 | 6/9/2017 | Wire transfer for $10,000 from Mexico to the United States |
|---|---|---|---|

## COUNT FIVE
## WIRE FRAUD
## [18 U.S.C. § 1343]

46.     The Grand Jury incorporates by reference paragraphs 1 through 41 set out above as though fully restated and re-alleged herein.

47.     From in or around January of 2016, and continuing to in or around January of 2019, in the Western District of Texas and elsewhere, the Defendants,

**JUAN ENRIQUE KRAMER (1),**
and **ADRIANA PASTOR (2),**

aided and abetted by others known and unknown to the Grand Jury, and with intent to defraud, did unlawfully, willfully, and knowingly devise and execute the above-described scheme to defraud multiple victims known to the Grand Jury and to obtain money or property by means of materially false or fraudulent pretenses, knowingly did cause to be transmitted by wire in interstate and international commerce writings in violation of Title 18, United States Code, Section 1343, as set forth below:

| Count | Victim | Date | Item |
|---|---|---|---|
| 5 | CW 3+4 | 8/7/17 | Wire transfer for $15,000 from Mexico to the United States |

11

## NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE
[*See* Fed. R. Crim. P. 32.2]

This Notice of Demand for Forfeiture includes, but not limited to the properties described in Paragraphs II and IV.

### I.
### Fraud Violations and Forfeiture Statute
[Title 18 U.S.C. §§ 1343 and 1349, subject forfeiture pursuant to
Title 18 U.S.C. § 981(a)(1)(C),
made applicable to criminal forfeiture by Title 28 U.S.C. 2461]

As a result of the criminal violations set forth in Counts One through Six, the United States gives notice to the Defendants of its intent to seek the forfeiture of the property described below upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 981(a)(l)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which states:

> Title 18 U.S.C. § 981. Civil forfeiture
> (a)(1) The following property is subject to forfeiture to the United States:
> (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Wire Fraud and Conspiracy to Commit Wire Fraud are offenses constituting "specified unlawful activity" as defined in Title 18 U.S.C. § 1956(c)(7).

### II.
### Currency

**$59,589.32, More or Less, in United States Currency, seized on August 17, 2020 from Bank of American (account # XXXXXXXX7171),**

12

III.
## Money Judgment

**Money Judgment:** A sum of money equal to the amount of proceeds that constitutes or is derived from the proceeds traceable to the offenses for which Defendants are convicted.

IV.
## Substitute Assets

If any of the property described above as being subject to forfeiture for the violations set forth above, as a result of any act or omission of the Defendants:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the Court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek the forfeiture of any other property owned by the Defendant, up to the value of said money judgment, as substitute assets, pursuant to Fed. R. Crim. P. 32.2(e)(1) and Title 21 U.S.C. § 853(p).

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

ASHLEY HOFF
United States Attorney

By: **JUSTIN CHUNG**
Digitally signed by JUSTIN CHUNG
Date: 2021.04.01 11:04:58 -05'00'
JUSTIN CHUNG
Assistant United States Attorney

By: **MATTHEW KINSKEY**
Digitally signed by MATTHEW KINSKEY
Date: 2021.04.01 11:38:49 -05'00'
MATTHEW KINSKEY
Assistant United States Attorney

13