FILED
August 18, 2021
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY:_____BC_____
                        DEPUTY

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>**JUAN ENRIQUE KRAMER (1),**<br>**ADRIANA PASTOR (2),**<br>**KARINA HERNANDEZ (4)**<br><br>Defendants. | **SA-21-CR-00154-FB**<br><br>**SUPERSEDING INDICTMENT**<br><br>[Count One: Conspiracy to Commit Wire Fraud, 18 U.S.C §§ 1343, 1349,<br><br>Counts Two – Five: Wire Fraud, 18 U.S.C § 1343,<br><br>Count Six: Aiding or Assisting in Filing a False Tax Return, 26 U.S.C. § 7206,<br><br>Counts Seven and Eight: Failure to File an Individual Tax Return, 26 U.S.C. § 7203.] |

**THE GRAND JURY CHARGES**:

At all times material to this Indictment:

DEFENDANTS AND THEIR BUSINESS ENTITIES

1. Defendant **JUAN ENRIQUE KRAMER** was a citizen of Mexico with a visa permitting him to reside within the United States, and the husband of Defendant **PASTOR**.

2. Defendant **ADRIANA PASTOR** was a citizen of Mexico with a visa permitting her to reside within the United States, and the wife of Defendant **KRAMER**.

3. Defendants **KRAMER** and **PASTOR** resided within the San Antonio, Texas area, within the Western District of Texas.

4. Defendants **KRAMER** and **PASTOR** were the owners and operators of multiple businesses incorporated within the United States, including Emprequekas, LLC, and La Cantinita Holding, LLC. These companies were primarily focused on marketing and operating Mexican food restaurants.

5. In addition to running the restaurants themselves, Defendants **KRAMER** and **PASTOR** also advertised and promoted their ability to create similar restaurants for sale to investors.

6. Separately charged defendant Noel OLGUIN was a citizen of the United States who was part owner of a business called Texas Franchise and Business Consulting (TFBC). OLGUIN was hired by Mexican nationals to help them locate Texas-based businesses to invest in, for which TFBC was paid a commission.

7. Defendant **KARINA HERNANDEZ** was a citizen of the Mexico with a visa to reside within the United States and was also a part owner of TFBC. Defendant **HERNANDEZ** was hired by Mexican nationals to help them locate Texas-based businesses to invest in, for which TFBC was paid a commission.

## COUNT ONE
CONSPIRACY TO COMMIT WIRE FRAUD
[18 U.S.C. §§ 1343, 1349]

8. Beginning in or about December of 2015, and continuing to in or about January of 2019, in the Western District of Texas and elsewhere, the Defendants

**JUAN ENRIQUE KRAMER, (1)**
**ADRIANA PASTOR, (2),** and
**KARINA HERNANDEZ, (4)**

together and with persons known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree together and with each other and with other individuals both known and unknown to the Grand Jury to devise and execute a scheme to defraud multiple complainant restaurant purchasers and to obtain money by means of false and fraudulent pretenses, representations and promises, utilizing transmissions by wire in interstate and foreign commerce, in violation of Title 18, United States Code, §§ 1343 and 1349.

## **MANNER AND MEANS OF THE CONSPIRACY**

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

9. Defendants **KRAMER** and **PASTOR** marketed themselves as successful owners and operators of multiple restaurant locations within the United States and Mexico. The primary business that Defendants promoted was a line of Mexican food restaurants called "Las Quesadillas". Defendants did in fact own and operate multiple Las Quesadillas locations throughout Texas, including at least one in San Antonio.

10. Defendants **KRAMER** and **PASTOR** advertised that they were able to deliver "turn-key" restaurants to purchasers for a set fee. A "turn-key" restaurant meant that the Defendants would perform all the steps necessary to create and open a fully functional "Las Quesadillas" location. According to the Defendants' promotional literature, this included: finding and renting a suitable location, obtaining all necessary permits, assistance obtaining visas for purchasers to reside in the United States, completion of all construction, providing all necessary equipment, recipes, employee training, and handling all legal fees and incorporation issues. In sum, the concept sold by Defendants **KRAMER** and **PASTOR** was that they would create an

operating restaurant within three to four months of beginning construction, and then hand the business to the purchaser.

11. Defendants **KRAMER** and **PASTOR** charged approximately $105,000 to $115,000 for a single location, or approximately $250,000 for a "master license" agreement where they would promise not to open or sell any other Las Quesadillas restaurants within a certain area.

12. Defendants **KRAMER** and **PASTOR** primarily targeted Mexican national purchasers who were looking to open a business in the United States.

13. Defendants **KRAMER** and **PASTOR** advertised in print and online, offering franchise opportunities involving Las Quesadillas.

14. Defendants **KRAMER** and **PASTOR** agreed with separately charged defendant OLGUIN and defendant **HERNANDEZ** that TFBC would solicit business for the Las Quesadillas franchise and be paid a commission for sales to purchasers in return.

15. Separately charged defendant OLGUIN would attend investment fairs and conferences in Mexico and advertise his ability to help Mexican customers create a business within the United States. OLGUIN and **HERNANDEZ** met with customers and promoted the Las Quesadillas concept. OLGUIN and **HERNANDEZ** represented to potential purchasers that they had vetted Las Quesadillas and that it was a safe and secure opportunity. In fact, OLGUIN and **HERNANDEZ** were aware that **KRAMER** and **PASTOR** repeatedly took purchaser money, failed to deliver on their contracts, and refused to return purchaser funds.

16. OLGUIN, **HERNANDEZ**, and TFBC were paid approximately $20,000 to $25,000 as a commission for each successful deal that they brought to Defendants **KRAMER** and **PASTOR.**

17. Between January of 2016 and January of 2019, Defendants **KRAMER and PASTOR** entered into agreements with multiple purchasers in which they contracted to deliver them a fully operational Las Quesadillas franchise. Defendants **KRAMER** and **PASTOR** operated this business through the Emprequekas, LLC company, which was incorporated in Texas and listed a San Antonio address as its principal place of business.

18. Defendant **KRAMER** frequently promoted the Las Quesadillas business by displaying false and fraudulent accounting numbers to prospective purchasers, thereby deceiving them about the potential profitability of their investment.

19. Defendants **KRAMER, PASTOR,** OLGUIN, and **HERNANDEZ** marketed and sold multiple Las Quesadillas "turn-key" locations knowing that the restaurants would not be completed. On multiple occasions during this time frame, Defendants **KRAMER, PASTOR,** OLGUIN, and **HERNANDEZ** took purchaser funds and failed to provide the promised services.

20. In some instances, Defendants would take funds and never provide anything of value in return. More frequently, Defendant **KRAMER** would begin construction on a location selected by the purchasers, only to never complete the project beyond some initial construction. Because the majority of the purchasers resided in Mexico, they were unable to regularly visit the locations. Defendant **KRAMER** would communicate with them via phone calls and emails transmitted over the interstate and international wires, and either state that the construction process was proceeding as planned, or give excuses and explanations as to why there were delays. Defendant **KRAMER** made these representations knowing that they were false and that the restaurants would not be completed as scheduled, or at all.

21. When purchasers eventually discovered that the restaurants were not actually being built on time, Defendant **KRAMER** would make excuses as to the reason for the delay. When

purchasers began asking for their money to be returned, Defendant **KRAMER** would offer partial refunds, or stakes in other businesses as an alternative to repayment. When these methods failed, Defendants **KRAMER** and **PASTOR** would then threaten to sue the purchasers for breach of contract, before cutting off all communication entirely.

22. Rather than use the purchasers' funds to construct and complete the restaurant locations, Defendants **KRAMER** and **PASTOR** used the funds for their own personal expenses and to provide partial payments to previous purchasers who were demanding their money back.

23. OLGUIN and **HERNANDEZ** were aware that **KRAMER** and **PASTOR** would take purchasers' money without finishing the promised projects but continued to market Las Quesadillas to prospective purchasers to obtain a commission payment.

24. Defendants **KRAMER, PASTOR,** OLGUIN, and **HERNANDEZ** perpetrated this scheme on at least ten different victims between January of 2016 and January of 2019, resulting in a total loss of more than $1,000,000.

## **OVERT ACTS**

In furtherance of this conspiracy and to effect and accomplish its objects, the Defendants, or one or more unindicted conspirators, committed, among others, the following overt acts in the Western District of Texas and elsewhere:

25. In or about December of 2015, separately charged defendant OLGUIN met with complainant CW1 at a business conference in Mexico and arranged a meeting in San Antonio with Defendant **KRAMER** to promote the Las Quesadillas business.

26. On or about April 1, 2016, Defendant **KRAMER** met with CW1 in San Antonio, Texas, and executed a contract where Defendant **KRAMER** agreed to provide a turn-key

restaurant location in Austin, Texas, and rights to the franchise for the entire Austin area in return for $250,000.

27. On or about April 1, 2016, Defendant **KRAMER** met with CW1 in San Antonio, Texas and executed a contract where Defendant **KRAMER** agreed to provide a turn-key restaurant location in San Antonio, Texas in return for $115,000.

28. In or about March of 2016, OLGUIN directed CW1 to pay $50,000 to TFBC as a commission for arranging the above-described agreements. On or around March 18, 2016, CW1 sent $25,000 to TFBC. On or around March 25, 2016, CW1 sent the remaining $25,000 to TFBC.

29. On or about April 5, 2016, OLGUIN transmitted a copy of these agreements to CW1 in Mexico via electronic mail. **KRAMER** was copied on this e-mail communication.

30. Between on or about March 2016 and on or about May 2016, Defendants **KRAMER** and OLGUIN accepted approximately $325,000 in payments from CW1.

31. In or about March of 2016, Defendant OLGUIN met with complainant CW2 at a business conference in Mexico and arranged a meeting in El Paso, Texas with Defendant **KRAMER** to promote the Las Quesadillas business.

32. In or about June of 2016, Defendant **KRAMER** met CW2 in San Antonio, Texas and agreed to provide one turn-key location and a master license for the El Paso area in exchange for $250,000.

33. In or about June of 2016, Defendant **KRAMER** accepted $250,000 in payments from CW2.

34. In or about March of 2017, Defendant **PASTOR** met with CWs 3 and 4 in San Antonio, Texas, and discussed their potential purchase of a Las Quesadillas franchise.

35. On or about August 4, 2017, Defendant **KRAMER** met with CWs 3 and 4 in San Antonio, Texas, and executed a contract where CWs 3 and 4 agreed to place $25,000 in escrow, to be applied toward the future purchase of a Las Quesadillas franchise.

36. On or about August 4, 2017, Defendant **KRAMER** met with CWs 3 and 4 in San Antonio, Texas, and executed a contract where CWs 3 and 4 agreed to pay $105,000 in exchange for a single turn-key Las Quesadillas location in San Antonio, Texas.

37. Between on or about August 4, 2017 and August 10, 2017, Defendant **KRAMER** accepted $105,000 from CWs 3 and 4 in payment.

38. In or about October of 2016, CW5 engaged **HERNANDEZ** and OLGUIN to provide options for businesses in Texas for CW5 to invest in.

39. In or about March of 2017, Defendants **HERNANDEZ** and OLGUIN accepted $25,000 in payments from CW5.

40. On or about June 17, 2017, Defendant **KRAMER** met with CW5 in Houston, Texas and executed a contract where CW5 agreed to pay Defendant **KRAMER** $350,000 in exchange for one Las Quesadillas location to be created in Houston, Texas, and a master license for part of the Houston area.

41. Between June 27, 2017 and February 28, 2018, Defendant **KRAMER** accepted approximately $300,000 from CW5 in payment.

All in violation of Title 18, United States Code, § 1349.

**COUNTS TWO AND THREE**
WIRE FRAUD
[18 U.S.C. § 1343]

42. The Grand Jury incorporates by reference paragraphs 1 through 41 set out above as though fully restated and re-alleged herein.

43. From in or around January of 2016, and continuing to in or around January of 2019, in the Western District of Texas and elsewhere, the Defendant,

**JUAN ENRIQUE KRAMER, (1),**

aided and abetted by others known and unknown to the Grand Jury, and with intent to defraud, did unlawfully, willfully, and knowingly devise and execute the above-described scheme to defraud multiple victims known to the Grand Jury and to obtain money or property by means of materially false or fraudulent pretenses, knowingly did cause to be transmitted by wire in interstate and international commerce writings in violation of Title 18, United States Code, Section 1343, as set forth below:

| Count | Victim | Date | Item |
|---|---|---|---|
| 2 | CW 1 | 12/28/2016 | Email to CW 1 detailing progress on restaurant |
| 3 | CW 2 | 6/17/2016 | Wire transfer for $164,179.56 from Mexico to the United States |

**COUNT FOUR**
WIRE FRAUD
[18 U.S.C. § 1343]

44. The Grand Jury incorporates by reference paragraphs 1 through 41 set out above as though fully restated and re-alleged herein.

45. From in or around January of 2016, and continuing to in or around January of 2019, in the Western District of Texas and elsewhere, the Defendants,

**JUAN ENRIQUE KRAMER, (1),** and
**KARINA HERNANDEZ, (4)**

aided and abetted by others known and unknown to the Grand Jury, and with intent to defraud, did unlawfully, willfully, and knowingly devise and execute the above-described scheme to defraud multiple victims known to the Grand Jury and to obtain money or property by means of materially

9

false or fraudulent pretenses, knowingly did cause to be transmitted by wire in interstate and international commerce writings in violation of Title 18, United States Code, Section 1343, as set forth below:

| 4 | CW 5 | 6/9/2017 | Wire transfer for $10,000 from Mexico to the United States |
|---|------|----------|-------------------------------------------------------------|

## COUNT FIVE
## WIRE FRAUD
## [18 U.S.C. § 1343]

46. The Grand Jury incorporates by reference paragraphs 1 through 41 set out above as though fully restated and re-alleged herein.

47. From in or around January of 2016, and continuing to in or around January of 2019, in the Western District of Texas and elsewhere, the Defendants,

**JUAN ENRIQUE KRAMER, (1),** and
**ADRIANA PASTOR, (2),**

aided and abetted by others known and unknown to the Grand Jury, and with intent to defraud, did unlawfully, willfully, and knowingly devise and execute the above-described scheme to defraud multiple victims known to the Grand Jury and to obtain money or property by means of materially false or fraudulent pretenses, knowingly did cause to be transmitted by wire in interstate and international commerce writings in violation of Title 18, United States Code, Section 1343, as set forth below:

| Count | Victim | Date | Item |
|-------|--------|------|------|
| 5 | CW 3+4 | 8/7/17 | Wire transfer for $15,000 from Mexico to the United States |

## COUNT SIX
AIDING AND ASSISTING IN THE PREPARATION AND PRESENTATION OF A FALSE AND FRAUDULENT TAX RETURN
[26 U.S.C. § 7206(2)]

48. On or about October 14, 2017, in the Western District of Texas and elsewhere, Defendants

**JUAN ENRIQUE KRAMER, (1),** and
**ADRIANA PASTOR, (2),**

willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the Internal Revenue Service of an individual tax return, Form 1040, for Defendants **KRAMER** and **PASTOR** for calendar year 2016, which was false and fraudulent as to a material matter. That Form 1040 reported their income as a loss of $5,671, in line item 22. As the Defendants knew, this reported loss of $5,671 did not include, report, or account for any funds paid to them by purchasers of Las Quesadillas franchises during the year 2016.

All in violation of Title 26, United States Code, Section 7206(2).

## COUNT SEVEN
FAILURE TO FILE AN INDIVIDUAL TAX RETURN
[26 U.S.C. § 7203]

49. During the calendar year 2017, in the Western District of Texas and elsewhere Defendants

**JUAN ENRIQUE KRAMER, (1),** and
**ADRIANA PASTOR, (2),**

who were residents of San Antonio, Texas, had and received gross income in excess of $20,800. By reason of such gross income, the Defendants were required by law, following the close of calendar year 2017, and on or before April 15, 2018, to make an income tax return to the Internal Revenue Service Center, at Austin, Texas, to a person assigned to receive returns at the local office

of the Internal Revenue Service at Austin, Texas, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of their gross income and any deductions and credits to which they were entitled. Well knowing and believing all of the foregoing, they did willfully fail, on or about April 15, 2018, in the Western District of Texas and elsewhere, to make an income tax return.

All in violation of Title 26, United States Code, Section 7203.

## COUNT EIGHT
FAILURE TO FILE AN INDIVIDUAL TAX RETURN
[26 U.S.C. § 7203]

50. During the calendar year 2018, in the Western District of Texas and elsewhere, Defendants

**JUAN ENRIQUE KRAMER, (1),** and
**ADRIANA PASTOR, (2),**

who were residents of San Antonio, Texas, had and received gross income in excess of $24,000. By reason of such gross income, the Defendants were required by law, following the close of calendar year 2018, and on or before April 15, 2019, to make an income tax return to the Internal Revenue Service Center, at Austin, Texas, to a person assigned to receive returns at the local office of the Internal Revenue Service at Austin, Texas, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of their gross income and any deductions and credits to which they were entitled. Well knowing and believing all of the foregoing, they did willfully fail, on or about April 15, 2019, in the Western District of Texas and elsewhere, to make an income tax return.

All in violation of Title 26, United States Code, Section 7203.

## NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE
[*See* Fed. R. Crim. P. 32.2]

This Notice of Demand for Forfeiture includes, but is not limited to the properties described in Paragraphs II and IV.

### I.
### Fraud Violations and Forfeiture Statute
[Title 18 U.S.C. §§ 1343 and 1349, subject forfeiture pursuant to
Title 18 U.S.C. § 981(a)(1)(C),
made applicable to criminal forfeiture by Title 28 U.S.C. § 2461]

As a result of the criminal violations set forth in Counts One through Five, the United States gives notice to the Defendants of its intent to seek the forfeiture of the property described below upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 981(a)(l)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which states:

> **Title 18 U.S.C. § 981. Civil forfeiture**
> **(a)(1)** The following property is subject to forfeiture to the United States:
> **(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Wire Fraud and Conspiracy to Commit Wire Fraud are offenses constituting "specified unlawful activity" as defined in Title 18 U.S.C. § 1956(c)(7).

### II.
### Currency

**$59,589.32, More or Less, in United States Currency, seized on August 17, 2020 from Bank of America (account # XXXXXXXX7171),**

### III.
### Money Judgment

**Money Judgment:** A sum of money equal to the amount of proceeds that constitutes or is derived from the proceeds traceable to the offenses for which Defendants are convicted.

# IV.
## Substitute Assets

If any of the property described above as being subject to forfeiture for the violations set forth above, as a result of any act or omission of the Defendants:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the Court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek the forfeiture of any other property owned by the Defendant, up to the value of said money judgment, as substitute assets, pursuant to Fed. R. Crim. P. 32.2(e)(1) and Title 21 U.S.C. § 853(p).

A TRUE BILL.

███████████████

FOREPERSON OF THE GRAND JURY

ASHLEY HOFF
United States Attorney

_____
FOR JUSTIN CHUNG
Assistant United States Attorney

and

_____
FOR MATTHEW KINSKEY
Assistant United States Attorney